UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X
UNITED STATES OF AMERICA,

                                                    09 CR 196 (RPP)

                    - v. -

                                                    **OPINION AND ORDER**

ADEREMI J. AKEFE, and
NA-HEEM TOKUMBO ALADE,

                              Defendants.
----------------------------------------------------------X

**ROBERT P. PATTERSON, JR., U.S.D.J.**

 Defendants Aderemi J. Akefe and Na-Heem Tokumbo Alade each move for

judgments of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure or,

in the alternative, new trials pursuant to Rule 33 of the Federal Rules of Criminal

Procedure.  Akefe also moves for reconsideration of this Court's order denying his oral

motion for continued release on bail pending sentence or appeal.  For the reasons

discussed herein, each of Defendants' motions is denied.


## I.  BACKGROUND

 In a two-count indictment, both Defendants were charged with conspiracy to

distribute and possess with intent to distribute one kilogram and more of heroin from in

or about 2005 to on or about February 18, 2009, in violation of 21 U.S.C. §§ 812,

841(a)(1), 841(b)(1)(A) & 846 (count one) and with conspiracy to import into the United

States one kilogram and more of heroin from in or about 2005 to on or about February

18, 2009, in violation of 21 U.S.C. §§ 812, 952(a), 960(a)(1), 960(b)(1)(A) & 963.  On

March 18, 2010, after a seven-day jury trial, and approximately one day of deliberations,

the jury returned unanimous guilty verdicts on each count as to each Defendant.  The jury also unanimously answered the special interrogatory as to drug weight, finding that for each of the two charged conspiracies, each of the Defendants either had personal involvement with or it was reasonably foreseeable to that defendant that the conspiracy involved one kilogram and more of heroin.

At the close of the Government's evidence, each Defendant moved for a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure.  (Trial Transcript (hereinafter "Tr.") at 977-87, 1004-1010.)  Akefe argued that the evidence was insufficient for any rational jury to convict beyond a reasonable doubt because, based on the evidence presented, it was just as plausible that Akefe acted without knowledge as that he acted with knowledge of the conspiracy.  Akefe further argued that the Government's cooperating witness was not sufficiently credible for a reasonable juror to credit.  (Id. at 977-78.)  Alade, making some of the same arguments put forth in the instant motion, argued that the Government had offered insufficient evidence to show Alade knew of the existence of the alleged conspiracy and knowingly joined and participated in it.  (Id. at 979-87, 1004-10.)  Defendants' motions at that time were denied.  (Id. at 1010.)

After the jury returned its verdict, Defendants renewed their motions for judgments of acquittal or, in the alternative, new trials.  On April 1, 2010, Defendant Alade submitted his memorandum of law in support of his motion to vacate the jury's verdict under Fed. R. Crim. P. 29 or for a new trial under Fed. R. Crim. P. 33 ("Alade Mem.").  On April 2, 2010, Defendant Akefe submitted his memorandum of law in support of his motion for a new trial pursuant to Fed. R. Crim. P. 33 ("Akefe Mem.") and

a memorandum of law in support of his motion for reconsideration of detention pending sentence or appeal ("Akefe Bail Mem.").[1]  On April 23, 2010, the Government submitted its memorandum of law in opposition to Defendants' motions for judgments of acquittal, new trials and bail pending sentence or appeal ("Gov't Mem.").  On May 5, 2010, Defendant Alade submitted a memorandum of law in further support of his motion to vacate the jury's verdict or for a new trial ("Alade Reply Mem.").[2]


## II.  THE GOVERNMENT'S EVIDENCE AT TRIAL

Much of the Government's evidence is not challenged in the instant motion.  In particular, Defendants do not dispute that the Government's evidence was sufficient to show the existence of the charged conspiracies, nor do they dispute the sufficiency of the Government's evidence as it relates to the weight of heroin involved in the charged conspiracies.  Rather, Alade argues that the Government's evidence was insufficient for a rational jury to find beyond a reasonable doubt that he acted knowingly and with intent to participate in the charged conspiracies.[3]  Viewing the evidence in the light most favorable to the Government and drawing all permissible inferences in the Government's favor, United States v. Guadagna, 183 F.3d 122, 129 (2d Cir. 1999), the following facts were established at trial.

---

[1]       By motion dated April 2, 2010, Defendant Akefe also joined in Defendant Alade's memorandum of law in support of his motion for a directed verdict or new trial.

[2]       Defendant Akefe did not submit a reply memorandum.

[3]       Defendant Akefe does not make any independent arguments in support of a directed verdict but rather joins in Alade's motion for a directed verdict or new trial and raises two additional grounds for a new trial.

**A.  Hafrida Saad**

Hafrida Saad, a cooperating witness for the Government who was arrested at JFK airport on February 18, 2009 with one and a half kilos of heroin, testified that between 2005 and 2009 she had brought narcotics into the United States from India which she had obtained from her boyfriend Abraham Orji ("Abby")[4] and his friend Innocent (a/k/a "Inno").  (Tr. at 371-74, 390-91.)  Both Abby and Inno are men of Nigerian ethnic origin, residing in India, and both speak English and Yoruba.  (Id. at 374.)  On each trip she travelled under the name "Shelena" and she was not advised by Abby or Innocent of the identity of the person to whom she would make delivery of the narcotics.  (Id. at 372, 377.)  Instead, Abby or Innocent would advise the person or persons arranging for the receipt of the narcotics of Saad's telephone number and she would be called on the telephone and receive directions about the specific time and place of delivery from a person or persons once she was safely in the United States.  (See id. at 393, 400-01.)  She testified that she was paid $1000 per each 100 grams she imported, which amounted to between $5,000 and $20,000 per trip, but was not paid in full immediately and sometimes would have to wait for payment until the drugs were sold.  (Id. at 390-91.)

On a previous trip in 2007, Saad flew from India to New York with approximately two kilograms of narcotics in her suitcase, and then took a bus from the Port Authority Bus Terminal to Detroit.  (Id. at 392.)  In Detroit, she was contacted by an unknown person by telephone and she gave the drugs to an old man she did not know in a parking lot for which, at the time, she received about $10,000.  (Id. at 393-94.)  She returned to New York by bus and sent the $10,000 to Abby by Western Union and

---

[4]        Ms. Saad testified that Abby is also known as Kasope Sangodipe.  (Tr. at 371.)

MoneyGram.  (Id. at 394.)  Per Innocent's instructions, she returned to Detroit a few days later to pick up the remainder of the payment, approximately $15,000 more.  (Id. at 395.) Saad used some of this money to pay for the expenses of the trip and, at Innocent's instruction, gave the rest to a person in Brooklyn.  (Id.)[5]

Saad testified that in February 2009 Abby brought heroin to Saad at her residence, already packed in a suitcase, which he said he had picked up from Innocent.  (Id. at 396.) Saad then took a flight from Bombay to New York and entered the country using a passport bearing the false name "Shelena."  (Id. at 372, 396-97.)  Upon her arrival in New York, she was arrested.  (Id.)[6]

Detective Francis Berberich along with Special Agents Jennifer Jordan and Michael Conlon arrived in the private screening area where Saad's luggage had been searched after the narcotics had been removed from the suitcase.  (Id. at 236.)  The total weight of the heroin recovered from Saad's suitcase was approximately 1552 grams.  (Id. at 208; Government Exhibits ("GX") 5, 5S.)  Saad agreed to cooperate and provided statements about her past criminal involvement to the Drug Enforcement Strike Force agents and participated in consensually recorded telephone calls and text messages first with Abby and Innocent and then with Defendants over the next three days.  (Tr. at 239.)

--------

[5]     Detective Francis Berberich of the Drug Enforcement Strike Force testified that in January 2008, in response to information passed along to him from the Detroit and Atlanta DEA field divisions, he had gone to the Port Authority Bus Terminal and placed Hafrida Saad under surveillance as she walked to the New Yorker hotel, checked into a room, left the room and later returned to the room, at which point the surveilling agents made a case decision to terminate surveillance.  (Tr. at 232-33, 249-50, 259-60.)

[6]     Officer Alexandra Brito of the Passenger Enforcement Rover Team within Customs and Border Protection testified about the arrest of Hafrida Saad on February 18, 2009 at JFK International Airport.  (Tr. at 201-06.)

**B.  Telephone Calls Recorded on February 18 and 19, 2009**

After Saad's arrest, Detective Berberich recorded four telephone calls between Saad and Abby and Innocent, who acted as her handlers in India.  (GXs 2, 4T-1, 4T-2, 4T-3, 4T-4.)[7]  At the direction of law enforcement, on February 18, 2009, Saad placed a call to Inno at 10:09AM at a phone number in India, where Saad confirmed that she had arrived, told Inno she was at the train station and asked him what she should do.  (GX 4T-1.)

| | |
|---|---|
| COURIER: | Oh, can you, can you tell, can you tell somebody to . . . Or can you tell somebody to pick it up or something. |
| INNO: | . . . They cannot . . . They cannot.  Let me try.  They, they cannot. |
| COURIER: | Okay. |
| INNO: | [I/U] . . . Let me call them back, Eh? . . . |
| COURIER: | Is it, is it the same person like the last time? |
| INNO: | Huh? |
| COURIER: | The, the last time?  Is it the same person? |
| INNO: | . . . No, no, no . . . Not him. |
| COURIER: | No?  Oh.  But the same place? |
| INNO: | Ehuh.  The same place.  Yeah. |
| COURIER: | Okay.  Okay I call you back in ten minutes. |

---

[7]     At trial, for each recording played, the Government moved both the recording and a transcript of the recording into evidence.  Government Exhibits 2 and 3 refer to two CDs of recordings, each containing six calls (Tr. at 241, 339) and government exhibits including the letter "T" refer to the Government's prepared transcript for each particular call.  Defendants did not stipulate to the accuracy of the transcriptions.  Therefore, for each recording, a corresponding transcript was admitted only as an aid to the jury.  (Id. at 243, 340-41.)  The jury was instructed that the evidence was what they heard on the recording, not what they read on the transcript.  In this opinion, citations to recordings of particular calls refer to both the recordings and the corresponding transcripts, but for convenience, when referring to both a recording and a transcript, this opinion cites only the "T" exhibit.  Direct quotes from recordings noted in this opinion are drawn from the "T" transcript exhibits, the exact wording of which the jury was entitled to credit, and the Court does credit, when drawing every permissible inference in the Government's favor as it must do on a Rule 29 motion.

(GX 4T-1.)[8] Twenty-six minutes later, Saad again called Inno in India and he instructed

her to call Abby. (GX 4T-2.) At 10:42AM, Saad placed a call to Abby at another phone

number in India.

        COURIER:    [U/I] How, what should I do?
        ABBY:       Yeah, yeah. Y . . . you go to Detroit.
        COURIER:    When?
        ABBY:       [U/I] . . . today [U/I], you know.
        COURIER:    Today?
        ABBY:       Yeah.
        COURIER:    And who I'm gonna to meet with?
        ABBY:       When you get there they will call you.

(GX 4T-3.) Abby then instructed Saad to call him back in thirty minutes. (Id.) Law

enforcement agents provided a cellular phone to Saad with the area code 718 (the "718

Number") and at 2:03PM on February 18, 2009, Saad used the 718 Number to call Abby.

She explained to Abby that she had bought a new phone, and he could call her on the new

number now. (GX 4T-4.) Saad told Abby that there was a bus leaving that night and she

would "be there tomorrow. Later tomorrow, like afternoon or something." (Id.) Abby

explained that he would give Saad's telephone number to the people she would be

meeting in Detroit:

        COURIER:    So, uh. Who I'm going to meet there?
        ABBY:       Mmm, okay, cause uh, these people they want to have your
                    number so they can call you.
        COURIER:    Oh. . .
        ABBY:       You know you know the way they behave. Now, they
                    don't want to give . . .
        COURIER:    Yeah
        ABBY:       You know they . . . so but anyway, I will give this number
                    now okay . . .

--------------------------------------------

[8]        Unless otherwise noted, all ellipses and bracketed notes are the work of the transcriber. [U/I]
indicates unintelligible; [PH] indicates a phonetic rendering. The [I/U] in GX 4T-1 appears to be a
typographical error that was intended as [U/I].

(Id.)  Abby confirmed again that she would be meeting a different person than last time and then Saad asked where she should stay in Detroit:

| COURIER: | Okay, . . . Okay.  Should I uh . . . When I get there should I uh, stay in the same hotel or what? |
| ABBY: | Mmm, It's okay. [U/I] |
| COURIER: | Or they, they will they will tell me tell you which hotel I should stay? |
| ABBY: | Mmm, they will speak to you, but you can stay in the same place.  But if, if anything just come up, I will let you know. |

(Id.)  Finally, the following exchange occurred:

| ABBY: | You know, they, . . . I can't.  I can't give you their number. They don't want you to know them now.  So they will call you.  Alright.  I'll give your number.  They will call you. |
| COURIER: | How about if I just go there?  I, I, now I go there . . . I, I, if I'm in Detroit now, how about if they don't call me? |
| ABBY: | Oh god!  They will now!  They are waiting for the thing now.  You know.  They will call you.  They have to. They're waiting already now. |
| COURIER: | Alright.  No problem.  Okay. |

(Id.)  The contents of the four calls recorded on February 18, 2009 are consistent with Saad's testimony about the *modus operandi* of this heroin conspiracy, namely that Saad never knew the identity or telephone number of the person or persons she would meet in order to make delivery of the heroin and that Abby and Inno would arrange for someone in the United States to call Saad on her cellular phone in order to set up a meeting.

On February 19, 2009, law enforcement agents recorded a series of six more calls between Saad and either Abby or Innocent that took place between 8:50PM and 10:20PM.  In the first call, Saad, pretending to be in Detroit, told Innocent that no one had called her yet and Innocent reassured Saad, stating: "I will call just relax now"; "Just wait . . . go to your room"; and "He'll call you, he'll call you very soon.  I just spoke to him."  (GX 4T-7.)  In the following calls from the evening of February 19, 2009, Saad

aked Abby and Innocent to give her the telephone number of the person she was to meet

because her cellular phone was running out of credits; neither Abby nor Innocent gave

Saad a number she could call, instead repeating that someone would call her.  (See GXs

4T-8, 4T-9, 4T-10, 4T-11, 4T-12; Tr. at 403-05.)

**C.  Text Messages Sent and Received on the Morning of February 20, 2009**

On the afternoon and evening of February 19, 2009, Special Agent John Livanis

kept the DEA cellular phone with the 718 Number, in order to monitor text messages and

incoming calls on that phone.  (Tr. at 341-42.)  Agent Livanis testified that the 718

Number received a text message from a telephone number in India which was time-

stamped 2:19AM (on February 20, 2009) and read "Traveler Inn on Telegraph BTW

Plymouth and West Chicago."  (Id. at 348.)[9]  The text message was received from one of

the Indian telephone numbers used by Abby.  (Compare id. at 348 and GX 4T-4.)  The

718 Number received missed calls from two different telephone numbers bearing

Michigan area codes between 9:00 and 10:00AM on the morning of February 20, 2009.

(Tr. at 342, 349.)  A number with a 248 area code (the "248 Number") called the 718

Number at 9:19AM and a number with a 313 area code (the "313 Number") called the

718 Number at 9:35AM.  (Id. at 349.)  In response to the two missed calls, at 10:02AM,

Agent Livanis sent a text message which read "I going be at room 136 at 11:00.  Don't

have enof minute to talk" to both the 248 Number and the 313 Number.  (Id. at 349, 360;

see also GX 13C.)  The text message did not provide the name of the hotel or its address.

---

[9]     There was some confusion during Agent Livanis' testimony about whether the 2:19AM referred to
Indian time or Eastern Standard Time.  (See Tr. at 348, 350-51, 488-89.)  If it refers to India time, the text
message was received in New York at 4:49PM EST on February 19, 2009.  Given Agent Galu's testimony
that Detroit agents first set up surveillance on the Traveler's Motor Inn on February 19, 2009 at 6:00 or
7:00PM (id. at 495-96, 500), it appears that the text message conveying the location of the hotel was
received by the undercover 718 Number on the afternoon of February 19, 2009, not in the middle of the
night on February 20, 2009.

**D.  Mr. Akefe**

(1)  <u>Arrest of Mr. Akefe</u>

Special Agent Michael Galu of the Detroit office of the Drug Enforcement Administration testified that he was kept informed of Saad's arrest and cooperation by agents in New York.  (Tr. at 495.)  After learning the location that Saad had been directed to by the text message from India, on February 19, 2009, Galu and other agents rented a room at the Travelers Motor Inn in Redford, Michigan on Telegraph Road between Plymouth Road and West Chicago Road.  (<u>Id.</u> at 495-96.)  Agent Galu informed the agents in New York which room his team had rented (number 136) and the agents commenced surveillance on that room at 6:00 or 7:00PM on the evening of February 19, 2009.  (<u>Id.</u> at 496, 500, 678-79.)  The Detroit agents terminated surveillance some time between 10:00 and 11:30PM that night and resumed the next morning at approximately 10:00AM.  (<u>Id.</u> at 502-03; 678-79.)  At 10:02AM on February 20, 2009, Agent Livanis sent the above-mentioned text message to the 313 Number: "I going be at room 136 at 11:00.  Don't have enof minute to talk."  (<u>Id.</u> at 349, 359-60.)  On the morning of February 20, 2009 there were approximately eight agents conducting surveillance on room 136.  (<u>Id.</u> at 503.)

At approximately 11:15AM, a black Jeep Wrangler drove into the parking lot of the Travelers Motor Inn and Mr. Akefe exited the Jeep and knocked on the door to room 136 and waited several moments for a response.  (<u>Id.</u> at 504, 680-82; GX 10-C.)  Two agents arrested Akefe and Agent Galu retrieved a cellular phone from the ground.  (Tr. at 506.)  Agent Galu inspected the phone, determined that the number corresponding to the phone was the 313 Number, and found the text message that had been sent by Agent

Livanis purporting to state the room in which the courier would be waiting.  (Id. at 506-08.)

Agent Galu, along with other agents, searched Akefe's Jeep and found a second cellular phone and a brown paper bag containing $9,980 in cash, comprised of twenty and hundred-dollar bills and arranged in eight bundles wrapped in rubber bands.  (Id. at 509, 512, 683, 724-25.)  The agents also found a variety of personal effects in their search of Akefe and his vehicle, including a lottery ticket with handwriting on the back.  (Id. at 575-77.)  The handwriting on the ticket included the words:  "Inno," "India," "Travel Inn," "Telegraph," "Chicago," "RM 136" and the full telephone number for the undercover 718 Number used by Saad and Agent Livanis.  (Id. at 577; GX 12.)

(2)  Post-Arrest Statements by Mr. Akefe

After advising Akefe of his Miranda rights and after Akefe said he understood them, Agent Galu interviewed Akefe in the presence of another agent.  (Tr. at 527-28.) Akefe stated that his cousin, Adebayo Odumade, had called Akefe early that morning and asked if Akefe would speak to a friend of Odumade's, Akin Egun.  (Id. at 528, 536.) Akefe provided a Nigerian phone number for Odumade:  234-802-318-6959, and provided a Nigerian phone number for Egun:  234-802-322-8747.  (Id. at 530, 536-37.) Akefe told Agent Galu that he spoke with Egun and that Egun told Akefe that he wanted him to meet a lady he had sent to Detroit and pick up a suitcase with Indian clothing in it. (Id. at 537.)  Akefe told Agent Galu that Egun had given him the name of the hotel where the lady was staying, the room number and a phone number with a 718 area code where he could reach the lady.  (Id. at 538.)  Akefe told Agent Galu that he tried to call the hotel room and the 718 Number and there was no answer at either number, but that he received

11

a text message from the lady.  (Id.)  Finally, Akefe told Agent Galu that the money found in his vehicle was money he had collected from his business renting apartments in Detroit.  (Id.)

(3)  Telephone Records Showing Calls Between Mr. Akefe and Nigeria

Telephone records for both cellular telephones recovered at the time of Akefe's arrest were introduced in evidence at trial.[10]  Between the two telephones, Akefe received eight incoming calls on February 19, 2009 from the Nigerian number Akefe provided for his cousin Adebayo Odumade.  (See GXs 14, 15; see also Tr. at 542-46, 549-52; GXs 14S, 15S.)  On the morning of February 20, 2009, between 6:46 and 7:33AM,[11] Akefe received one incoming call from the Nigerian number he provided for Akin Egun, lasting one minute, as well as one incoming call from Odumade.  (GXs 14, 15.)  The records confirm that on the morning of February 20, 2009, after receiving the two incoming calls from Egun and Odumade, Akefe placed three outgoing calls to the undercover 718 Number between 9:36AM and 9:46AM and received a text message from the undercover 718 Number at 10:01AM.  (GX 15.)  Within fifteen minutes of receiving the text message from the undercover 718 Number, Akefe received two more incoming calls from Egun's Nigerian number, each lasting two minutes.  (Id.)

(4)  Cooperating Witness Testimony Against Mr. Akefe

The Government called a second cooperating witness, Ademilola Ogunmokun, who testified about Akefe only.  Ogunmokun, a Nigerian national, testified that he

---

[10]     For each of the phones seized from Akefe and Alade at the time of their respective arrests, Special Agent Thomas Panzitta testified as to what telephone number corresponded to each phone.  (Tr. at 894, 897, 903, 907-09.)  The jury also saw various photographs taken of the screens of the phones, showing select incoming and outgoing calls and text messages.  (See Tr. at 895-910.)

[11]     Unless otherwise noted, all times listed reflect Eastern Standard Time ("EST") and are converted from the times zones listed in the underlying phone records as necessary.

became involved with distributing heroin through his brother-in-law (and Akefe's cousin) Adebayo Odumade who was in Nigeria, and that at Odumade's direction he picked up packages of heroin in different cities (New York, Philadelphia, Chicago) and delivered them to other cities (Detroit and Chicago).  (Id. at 750, 756-59.)  Ogunmokun testified that he delivered heroin to Akefe in Detroit between five and seven times, starting in late spring 2007 and ending in August 2008.  (Id. at 762-63, 767, 775.)  Ogunmokun also returned to Detroit to collect payment for the heroin ten times or more and he was never paid in full at the time he delivered heroin.  (Id. at 768-69.)  Ogunmokun and Akefe were arrested together in July 2007 in Detroit when police officers found Ogunmokun stuffing cash – $40,000 or more – into the pockets of his clothing, which Ogunmokun testified was payment for previous heroin deliveries to Akefe, although at the time of his arrest in July 2007, Ogunmokun told the arresting officers that he had inherited the money from his father and that he planned to invest in real estate in Detroit.  (Id. at 772-74.)

**E.  Mr. Alade**

(1)  Telephone Calls and Text Messages
      Between Mr. Alade and Law Enforcement Agents

On the morning of February 20, 2009, Agent Livanis (posing as Ms. Saad) was in contact with Alade's 248 Number by way of text messages.  The following sequence of twxt messages occurred after the 718 Number received a missed call from the 248 Number:

|  Time (EST) | Author (Livanis or Alade) | Message |
|---|---|---|
| 10:02:11 AM | Livanis | I going be at room 136 at 11oclok donthave enof minute to talk. |
| 10:02:36 AM | Alade | K |
| 10:31:08 AM | Livanis | what car u have so i know is u? bring money. 5000 |

| 10:46:48 AM | Alade | Dont have a car so am on a ride will call u when am on d way |
| 11:02:53 AM | Livanis | what time u come? |
| 11:05:53 AM | Livanis | u in jeep? |
| 11:08:48 AM | Alade | No am at work after will come c u |
| 11:12:26 AM | Livanis | is ur friend in jeep outside?  He knock my door. |
| 11:12:38 AM | Alade | Nope |
| 11:30:12 AM | Livanis | need to see u now. Where r u? |
| 11:31:07 AM | Alade | At work cant till i get off |

(GX 13C; see also GX 13S; Alade Mem. at 4-5.)  New York agents also instructed Saad

to place a series of calls to the 248 Number in order to arrange a meeting.  (Tr. at

243-46.)  When these calls were placed, Detective Berberich called Saad, who was in a

different location in the presence of other agents, and then called the 248 Number,

creating a three-way call.  (Id.)  Detective Berberich recorded (or attempted to record) the

calls from his location – which was the middle point in the three-way calls.  (Id.)  In the

first call, which commenced at approximately 11:38AM,[12] Saad told the person who

answered the 248 Number (later identified as Alade) "I don't want to stay long" because

she had to catch a bus.  (GX 4T-5.)  The following exchange ensued:

> COURIER:    [U/I] Bus leaves in 30 minutes.  You know, I was waiting
> for you since.
> ALADE:      I, I explained to him this morning when he called me cause
> I didn't even know you were coming.  They didn't tell
> me nothing.  And, I'm not responsible for this.  This is just my
> uncle's stuff, I'm just helping him.  So when they told me
> you were here this morning.  I told them, first of all, I don't
> even have a car because I got into an accident.

(Id.)  On hearing that he did not have a car, Saad asked Alade "Should I bring it to you?"

(Id.)  Alade then stated "Uh, let me see.  You're on telegraph" and asked Saad if she

_____

[12]        According to the telephone records for the 248 Number, the call started at 11:38AM and lasted
approximately five minutes.  (GX 13A.)  The 11:44AM listed at the top of GX 4T-5 represents the
approximate time the call ended because Detective Berberich stated the time as 11:44AM at the end of the
recording.

could get to Warren and Greenfield.[13]  (Id.)  He told her that he would meet her at a

Marathon gas station at the corner of Greenfield and Warren in twenty minutes.  (Id.)

After Alade directed her to meet him at the Marathon gas station and after Saad asked

how she would recognize him and Alade responded that he is black and would be in a

black coat with blue jeans, Saad asked "[w]hat should I call you, your name, I mean" to

which Alade answered "Um, just call me K." and "K – yeah, like Kareem."  (Id.)  The

following exchange then occurred:

> COURIER:    Okay, you know, sorry I ask so much question because you
>                      know I don't want . . . mistake.
> ALADE:        . . . I understand, I understand . . .
> COURIER:    [U/I] with you, you understand.
> ALADE:        I understand, I understand.

(Id.)  After Akefe's arrest at approximately 11:20AM, Agent Galu was informed by

agents in New York that they were arranging a meeting with another individual with a

Detroit-area telephone number; and in response, Galu and three or four other agents went

to a Marathon gas station on the corner of Greenfield Road and Warren Avenue in

Dearborn, Michigan (the location given to them by the New York agents).  (Tr. at 514-

18.)  Agent Kevin Graber was one of the first to arrive at the gas station at approximately

12:00PM.  (Id. at 684.)  Agent Graber instructed Agent Galu to direct the New York

agents to have the cooperating witness switch the location from the Marathon gas station

to the Yum Yum donut shop next door.  (Id. at 685-86.)[14]  The agents established

---

[13]        Neither law enforcement agents nor Ms. Saad ever informed Alade of the name or location of the
hotel prior to Alade's comment "You're on telegraph."  (See Tr. at 350, GXs 4T-5, 13A, 13C.)  The fact he
knew Saad was on Telegraph without being so informed by Saad or law enforcement agents demonstrates
that Alade knew Saad was at the address Alade had provided by text message to his uncle Akin Billy Smith
the day before (discussed infra p. 18).
[14]        Agent Galu testified that, as he was en route from the Travelers Motor Inn to the Marathon gas
station, he received information that the meeting would take place at the Yum Yum donut shop instead of
the Marathon gas station.  (Tr. at 518.)

surveillance of the Yum Yum donut shop and the Marathon gas station shortly after 12:00PM.  (Id. at 684.)

Between 12:00PM and 12:04PM, the following text messages were sent between Agent Livanis (posing as Saad) and Alade:

> Livanis:   "do u have money for me for this thing?"
>
> Alade:   "No i don't"
>
> Livanis:   "need money for expenses  bus."

(GX 13C; see also GX 13S; Alade Mem. at 4-5.)  Defense counsel elicited testimony from Detective Berberich and Special Agent Jennifer Jordan that there was a second call placed between Alade and Saad that took place at approximately 12:16PM and was not recorded by law enforcement (the "Missing Call").  (See Tr. at 301-04.)  Detective Berberich testified that during the Missing Call, the recording device malfunctioned and that he did not hear what was said on the Missing Call at the time it took place.  (Id.)  Defense counsel further elicited that Saad changed the meeting location from the Marathon gas station to the Yum Yum donut shop during the Missing Call (id. at 314-18, 685-86) and that the location was changed at the direction of agents in Detroit (id. at 646).[15]

At approximately 12:24PM, agents recorded another call between Saad and Alade, which included the following exchange:

> ALADE:     Hello
> COURIER:   Hi Kay.  Where are you?
> ALADE:     Okay.  I'm coming up right now.  So you say you're at the
>            Yum Yum shop right?
> COURIER:   Yeah.  Yum Yum shop.  In the bathroom please.  You

---

[15]     The Missing Call, which lasted approximately one minute and eleven seconds (see GX 13A; *infra* note 16), is discussed in greater detail *infra*, part V.A.2, in connection with Alade's motion for a new trial.

|          | know. |
|----------|-------|
| ALADE:   | Okay alright. |
| COURIER: | Hold long?  How far are you?  How far are you? |
| ALADE:   | I'm like a minute away.  Like less than a minute. |
| COURIER: | Oh you're already there? |
| ALADE:   | I'm almost there.  I'm almost there.  I'm at red light next to the place. |
| COURIER: | Oh, Okay.  Okay. |
| ALADE:   | So I'll see you in a second. |
| COURIER: | Okay then.  Alright. |
| ALADE:   | Alright. |

(GX 4T-6.)

(2) <u>Arrest of Mr. Alade</u>

Some time between 12:24PM call and 12:30PM, the agents in Detroit observed an individual who matched the telephonic description that Alade had given to Saad, which was in turn relayed to Agent Galu by agents in New York, pull into the Marathon gas station in a white Cadillac Escalade and walk from the gas station towards the Yum Yum donut shop.  (Tr. at 521, 523, 684, 687.)  The individual, later identified as Alade, entered the donut shop and Agent Graber followed him into the donut shop shortly after.  (<u>Id.</u> at 521, 688.)  Alade started to walk in the direction of the ladies room but upon Agent Graber entering the shop, he exited the donut shop less than a minute after he had entered at which time he was approached and detained by agents.  (<u>Id.</u> at 522, 687-89.)  Agent Galu searched Alade and recovered a black touch-screen cellular telephone, approximately $350 in cash and other personal effects.  (<u>Id.</u> at 523, 624.)  Agent Graber recovered a second cellular phone from Alade's vehicle and confirmed that the phone found in Alade's car corresponded to the 248 Number by instructing the agents in New York to call the 248 Number they had been corresponding with and answering the phone when it rang.  (<u>Id.</u> at 526, 690-91.)

17

(3)  <u>Post-Arrest Statements by Mr. Alade</u>

After Alade's arrest, Agent Galu, with another agent present, advised Alade of his Miranda rights and Alade said he understood them and agreed to answer questions.  (<u>Id.</u> at 552.)  Alade told Agent Galu that his uncle, Akin Billy Smith, had asked Alade to meet a woman at a hotel on Telegraph and give her $100 for bus fare, but that his uncle had not asked him to pick anything up from her.  (<u>Id.</u> at 553, 658.)  Alade told Agent Galu that his uncle had given him the telephone number of the lady and that he did not know the lady on the telephone.  (<u>Id.</u> at 662-63.)  Alade provided a Nigerian telephone number for his uncle:  234-808-250-6678, who he said used to live in Detroit.  (<u>Id.</u> at 554.)  Alade told Agent Galu that he spoke to the lady and told her that he did not want to meet her at the hotel, and would meet her at the Marathon gas station; and Alade told Galu that "he didn't want to get in trouble by meeting her on Telegraph at the hotel."  (<u>Id.</u> at 555.)  Alade also told Agent Galu that he knew his uncle Akin Billy Smith "was involved in heroin trafficking."  (<u>Id.</u> at 556.)  Later, in the evening of February 20, 2009 as Agent Galu was escorting Alade to the jail processing center, upon seeing another person arrested in this case, Alade stated "oh man, I didn't know you guys got him too, man, I can help you out, I can help you out."  (<u>Id.</u> at 566-67.)  This statement was admitted solely against Alade.  (<u>See</u> <u>id.</u> at 944, 1490.)

(4)  <u>Telephone Records Showing Calls Between Mr. Alade and Nigeria</u>

Telephone records for both cellular telephones recovered at the time of Alade's arrest were introduced in evidence at trial.  In addition to showing the calls and text

messages between Alade and the undercover 718 Number discussed above,[16] the telephone records show that, between the two telephones, on the afternoon of February 19, 2009 between 12:38PM and 3:31PM, Alade received three incoming calls and placed two outgoing calls to the Nigerian number Alade provided for his uncle Akin Billy Smith.  (GXs 13A, 16A; see also Tr. at 559-61, 565-66; GXs 13S, 16S.)  Of these five calls, most were very short or went straight to voicemail, and the longest of the five lasted one minute and forty-one seconds.  (GXs 13A, 16A.)  At 3:32PM on February 19, 2009, Alade sent a text message to his uncle which read:  "Traveler inn on telegraph btw plymouth n west chicago . . ." (GX 16D.)[17]  This text message was sent before Saad's undercover 718 Number received a text message from Abby in India relaying the same hotel location to Saad.[18]  Alade received two more incoming calls from his uncle's Nigerian number at 4:24 and 4:25PM on February 19, 2009.  (GX 16A.)  On the morning of February 20, 2009, between the two phones, Alade received five incoming calls from his uncle's Nigerian number between 7:12 and 8:33AM, the longest of which lasted approximately six and a half minutes.  (GXs 13A, 16A.)  The records confirm that within minutes of the 8:33AM call from his uncle, Alade placed two outgoing calls to the

---

[16]     Counsel for Defendant Alade argues, and the Government does not dispute, that even though the telephone numbers of the caller are not reflected in the telephone records, the entries in GX 13A on 2/20/2009 at 11:38:40, 12:16:57 and 12:23:45 represent the first call recorded between Saad and Alade (GX 4T-5), the Missing Call and the second call recorded between Saad and Alade (GX 4T-6), respectively.  (See Alade Mem. at 8-9.)

[17]     While it initially appears from the phone records that this text message was sent at 2:32PM (see GXs 16A, 16D), the stipulation from the cellular service provider specifies that the time indicated for text messages represents Central Standard Time while the time indicated for calls represents Eastern Standard Time.  (GX 16S ¶ 1.b(5).)  This text message links Alade's uncle to Saad's handler Abby.

[18]     As previously noted, this text message from India was time-stamped 2:19AM on February 20, 2009.  (Tr. at 348.)  If that stamp represents India time, it was received at 4:19PM EST, which is also after Alade sent the address to his uncle.

undercover 718 Number at 8:35 and 8:36AM on February 20, 2009.  (GX 13A.)[19]  At

9:02AM on February 20, 2009, Alade received an incoming call and placed an outgoing

call to his uncle's Nigerian number.  (GX 16A.)  During the time Alade was

corresponding with Saad through telephone calls and text messages, he placed two

outgoing calls to his uncle's Nigerian number at 11:06AM and 12:11PM.  (Id.)  Finally,

after his arrest, between the two phones, Alade received six incoming calls from his uncle

between 1:19PM on February 20, 2009 and 8:09AM on the morning of February 21,

2009.  (GXs 13A, 16A.)[20]

(5)   Evidence of Prior Court Proceeding Offered to
       Show Mr. Alade's Knowledge of the Charged Conspiracy

The Government read into the record a stipulation among counsel regarding a

prior court proceeding related to another heroin transaction.  The stipulation read, in

pertinent part:

> 1.   From April 8, 2008 to April 10, 2008, there was testimony given
>       during a court proceeding regarding the delivery of a package
>       containing 995 grams of heroin that had been sent by express mail
>       from Texas to be delivered to an apartment in Detroit, Michigan.
> 2.   Na-Heem Tokumbo Alade was present for that court proceeding
>       and heard the following testimony being given:

(Tr. at 975.)  The stipulation contained three pieces of testimony (using exact quotes from

the witnesses), which were, in substance:  (i) the person who signed for the package of

heroin signed the name "A. Smith"; (ii) the last known occupant of the address to which

---

[19]      While Agent Livanis testified, based on his report, that the missed call placed from the 248
Number to the 718 Number occurred at 9:19AM (Tr. at 349), the telephone records for the 248 Number
indicate that the outgoing calls placed to the 718 Number occurred at 8:35 and 8:36AM (GX 13A).  There
is no explanation in the record for this discrepancy.

[20]      The telephone records for one of Alade's phones also show eleven calls from Akin Billy Smith's
Nigerian number between Alade's arrest and 11:10AM on the morning of February 21, 2009, which are
classified as "Routed Calls" without a corresponding "Inbound" entry.  This indicates an attempt was made
to call Alade's phone but the call was routed to a different number by the network and may never have
been completed.  (See GXs 16A, 16S.)

the package was sent was "Billy Akin Smith"; and (iii) two driver licenses found in the apartment bore the name "Akin Billy Smith."  (Id. at 975-76.)  This stipulation was admitted for a limited purpose.  The Court instructed the jury that "[i]t is admitted only insofar as it may show the defendant Alade had knowledge of facts that are stated in the stipulation."  (Id. at 976.)

### III.  DEFENSE CASES

### A.  Mr. Akefe

Mr. Akefe testified on his own behalf.  He testified that the cash recovered from his Jeep at the time of his arrest consisted of cash rent payments and a cash deposit he received as part of his property rental business, which he was planning to deposit at the bank on February 20, 2009.  (Id. at 1054-56, 1064.)  He also testified that his cousin Adebayo Odumade is a civil engineer in Nigeria, that he speaks to his cousin regularly, and that he had no knowledge of Odumade being involved in drug trafficking.  (Id. at 1056-57.)  Akefe further testified that on the morning of February 20, 2009, he received a call from Odumade who asked Akefe to do a favor for a friend, a man named Akin Egun; Akin Egun, in turn, asked Akefe to pick up luggage containing Indian clothing from a lady who had been stranded in Detroit for the last three days.  (Id. at 1058, 1060.)  Akefe testified that Ogunmokun's testimony was "a total lie" (id. at 1067) and there was no truth to Ogunmokun's testimony that he delivered drugs to Akefe on behalf of his brother-in-law and Akefe's cousin Adebayo Odumade (id. at 1075).

Akefe also called his wife, Alonda Jones-Akefe, who testified about her and her husband's real estate business and how they were acquainted with Ogunmokun because

they were discussing possible real estate investments with him.  (Id. at 1135-38,

1142-44.)

**B.  Mr. Alade**

Mr. Alade called DEA Special Agent Jennifer Jordan who testified about certain

evidence preservation procedures and chain of custody issues in this case, including the

process for placing the calls between Saad and Alade on February 20, 2009 and the

circumstances surrounding the Missing Call.  (Id. at 1157-59, 1168-78, 1182-1188, 1194-

97.)  Defense counsel elicited testimony from Agent Jordan regarding the device used to

record calls between Saad and Alade that conflicted with the testimony of Detective

Berberich in some respects.[21]

Alade called his fiancée, Monika Ross, who testified about the layout of the Yum

Yum donut shop and about a number of photographs she had taken of the area.  (Id. at

1236-39.)  She also testified as to Alade's good character, specifically his tendency to

loan money to others.  (Id. at 1239-40.)  Finally, Alade called Gladys Anderson who, like

Ms. Ross, testified as to Alade's good character and his history of loaning money to

others.  (Id. at 1248-51.)


### IV.  RULE 29 MOTION FOR JUDGMENT OF ACQUITTAL

Rule 29 permits a defendant to move for a judgment of acquittal after a jury has

returned a guilty verdict.  Fed. R. Crim. P. 29(c).  A defendant challenging the

sufficiency of the evidence supporting a conviction "bears a heavy burden."  United

States v. Finley, 245 F.3d 199, 202 (2d Cir. 2001).  The jury's guilty verdict must be

---

[21]     The specifics of Agent Jordan's testimony are discussed in greater detail *infra*, part V.A.2, in connection with Alade's motion for a new trial.

upheld unless the court concludes that "no rational trier of fact could have found the defendant guilty beyond a reasonable doubt." United States v. Reyes, 302 F.3d 48, 52 (2d Cir. 2002) (citing Jackson v. Virginia, 443 U.S. 307, 318-19 (1979)).  In making this assessment, the court must view all the evidence in the light most favorable to the Government and draw all permissible inferences in the Government's favor.  United States v. Guadagna, 183 F.3d 122, 129 (2d Cir. 1999).  The court must analyze each piece of evidence not in isolation but against the totality of the Government's case. Id. at 131.

### A.  Mr. Alade

Under the foregoing standards, the Government's evidence was sufficient for a rational jury to conclude beyond a reasonable doubt that Alade knowingly and intentionally joined the two charged conspiracies with the specific intent of furthering their illegal purposes.[22]  As a threshold matter, in the context of his Rule 29 motion, Alade repeatedly invokes language from United States v. Ceballos, 340 F.3d 115 (2d Cir. 2003), stating that in order for a defendant to be convicted of conspiracy, "he must in some sense promote [the] venture himself, make it his own, have a stake in its outcome, or make an affirmative attempt to further its purposes."  Id. at 124 (internal citations omitted); see also id. at 127-28 ("There must be proof that he intended to join the conspiracy, that is, that he participated in it, or in some way made an affirmative attempt to further the conspiracy's purposes, or made it his own venture in the sense of having a

---

[22]     While the Government requested a conscious avoidance charge in its initial written requests to charge, the Court is mindful that such a charge is only appropriate where the appropriate factual predicate for the charge exists.  See United States v. Ramirez, 320 F. App'x 7, 10-11 (2d Cir. 2009); United States v. Aina-Marshall, 336 F.3d 167, 170 (2d Cir. 2003).  The Court, therefore, did not include the requested conscious avoidance instruction in its initial draft charge.  The Government did not renew its request for a conscious avoidance instruction at the charging conference and the Court did not include such an instruction in its final charge delivered to the jury.  Because the Court did not have occasion to consider whether a conscious avoidance charge is appropriate in view of the trial record in this case, in deciding Alade's Rule 29 motion, the Court explicitly does not base this opinion on a theory of conscious avoidance.

stake in its outcome."). Alade's reliance on the cited language is misplaced because the Ceballos court's non-exhaustive recitations of types of proof that could be sufficient to show specific intent to join a conspiracy are listed in the alternative.[23] There is no question in this case that Alade "participated in" the charged conspiracies and that he took affirmative steps that, had they succeeded, would have furthered the purposes of the charged conspiracies. Alade contacted Ms. Saad at the 718 Number, set up a meeting at the Marathon gas station and arrived at the meeting, in an attempt to assist Saad at his uncle's behest. Here, defense counsel argues there was participation without knowledge. In contrast, in Ceballos, the defendant argued successfully on appeal that there was proof of knowledge without sufficient proof of participation. See id. at 128 (holding that knowledge of an unlawful enterprise coupled with receipt of funds from the unlawful enterprise as payment on a preexisting debt is insufficient to permit an inference that the defendant joined the unlawful enterprise, noting that "acquiescence by itself is not sufficient.") Therefore, Ceballos and other cases holding that knowledge without participation is insufficient to sustain a conspiracy conviction, are factually and legally inapposite and Alade's reliance on such cases is misplaced.[24]

Alade also argues that his "post-arrest statements do not support the inference that Mr. Alade was aware that the woman he was meeting was a drug courier." (Alade Mem. at 20.) This argument is unpersuasive as it is a rigid compartmentalization of the

---

[23]     Counsel for Alade also requested a jury charge based on the cited language from Ceballos, which is discussed, infra, part V.A.4.

[24]     See United States v. Jones, 393 F.3d 107, 112 (2d Cir. 2004) (holding defendants' presence at an apartment where drug transaction took place was insufficient to support the inference that one or both of the defendants participated in a scheme to deal drugs); United States v. Gaviria, 740 F.2d 174, 183-84 (2d Cir. 1984) (holding presence at apartment identified as "stash pad" coupled with knowledge that another individual with links to the apartment was engaged in the sale of narcotics was insufficient to establish defendants' knowing membership in alleged conspiracy).

Government's evidence instead of considering the totality of the Government's evidence, as required on a Rule 29 motion.  Guadagna, 183 F.3d at 131.  While each of Alade's post-arrest statements, standing alone, may not be sufficient to sustain a conspiracy conviction, when his post-arrest statements are considered in the light of the Government's other evidence of the actions he took in furtherance of the conspiracy and the statements he made while taking those actions, they are sufficient for a rational jury to find that Alade knowingly joined the charged conspiracies with the specific intent to promote their unlawful purposes.  Alade's comment that he "didn't want to get in trouble" by meeting the woman at the hotel (Tr. at 555) supports the inference that Alade knew that what he had been doing was something illegal, and his remark to the arresting agent that he could "help you out" upon seeing another individual arrested in this narcotics conspiracy (id. at 566-67) supports the inference that he had knowledge of narcotics activities by the other individual.  Further, when considered in connection with evidence showing Alade's admitted knowledge that his uncle was a heroin trafficker (id. at 556, 975-76), his telephone call with Saad where Alade stated "[t]his is just my uncle's stuff, I'm just helping him" (GX 4T-5), Saad's question on the same recorded call asking whether she should "bring it to you" (id.), his arranging the Marathon gas station for their meeting and his receipt of text messages stating "bring money. 5000" and "do u have money for me for this thing?" (GX 13C), the Government's evidence supports a finding by a rational jury that Alade knew he was meeting a heroin courier to pick up a package.

Relying on United States v. Lorenzo, 534 F.3d 153 (2d Cir. 2008), Alade argues that nothing in his post-arrest statements shows that he agreed on the essential nature of the plan.  (Alade Mem. at 20.)  As discussed *supra*, the Government's evidence must be

considered collectively and arguments that one particular category of evidence is insufficient are without merit.  Moreover, Lorenzo is factually and legally inapposite. That case involved two separate trips to the United States by a narcotics courier who later cooperated as a government witness.  Lorenzo, 534 F.3d at 155.  On the first trip, defendant Julio Lorenzo actively assisted the courier and provided her with $14,000, but there was no evidence as to Julio's or the courier's knowledge about what she was delivering; rather, the courier testified only that she "assumed that there were drugs" in the suitcase she delivered.  Id. at 157, 160.  On the second trip, which involved a controlled delivery, there was no question the transaction involved cocaine, but there was no evidence defendant Julio participated in, or had knowledge of, the second transaction – he was asleep throughout all the events at issue related to the second trip.  Id. at 157, 161.  Even considered in connection with a false exculpatory statement given by Julio to law enforcement, the court held the evidence insufficient to sustain a conspiracy conviction because the evidence lacked a "critical element" – evidence from which the jury could infer knowledge of the "nature and specific object of the conspiracy."  Id. at 160.  Absent more evidence connecting Julio to the conspiracy, knowledge of the "specific object" of the first transaction could not be attributed to Julio based on the established object of a later transaction in which Julio did not participate.

With respect to co-defendant Andrea Lorenzo, the court held that Andrea's presence during the first trip, a record of conversations between Andrea and the courier's handler in the Dominican Republic (who was Andrea's nephew), Andrea's greeting of the courier at her second trip, Andrea's transfer of one suitcase from the courier into Andrea's house, Andrea's instruction to the courier during the second visit to take a taxi

to a nearby hotel and a false exculpatory statement given by Andrea to law enforcement, were (like the evidence against Julio) insufficient to show her knowledge and intent to aid in the specific object of the conspiracy.  Id. at 161-62.  The court reasoned that the evidence, at most, supported an inference Andrea knew she was assisting in suspicious behavior, and her actions were equally consistent with providing hospitality to the girlfriend of her nephew.  Id.

Unlike Lorenzo, this case involves only one transaction and the Government's evidence does not suffer from the same gap in proof that was present for Julio Lorenzo. This is also not a case where the Government relies solely on the fact that a courier was steered to certain individuals as evidence of knowledge and intent on the part of those individuals.  Alade initiated contact with the courier (not the other way around), and there is no question that he actively participated in the transaction.  Indeed, after telephone calls with his uncle in Nigeria, Alade, by text message to his uncle, provided the hotel location to which the courier was then directed by Abby (who, like Alade's uncle, was unquestionably a member of the charged conspiracies).

While Alade repeatedly attempts to characterize his case as one where the evidence "gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence," id. at 162 (quoting United States v. Glenn, 312 F.3d 58, 70 (2d Cir. 2002)), arguing that it is just as plausible that Alade showed up to give Saad bus fare at the direction of his uncle, without any knowledge of the fact she was a heroin courier, his argument is unpersuasive.  The Government "need not negate every theory of innocence," Glenn, 312 F.3d at 63, and it need not "exclude every reasonable hypothesis other than that of guilt," Guadagna, 183 F.3d at 130.  Alade contacted the courier at the

telephone number Abby provided to unnamed conspirators,[25] Alade provided his uncle

with the address of the Travelers Inn to which Abby directed the courier, Alade set up a

meeting at the Marathon gas station when Saad asked "[s]hould I bring it to you?" and he

stated "[t]his is just my uncle's stuff, I'm just helping him," and he received a text

message, purportedly from the courier, asking "do u have money for this thing?"  (GXs

4T-5, 13C.)  This is not a case like <u>Glenn</u> where the evidence gave "equal or nearly

equal" support to an innocent explanation for Alade's actions.  From the evidence

presented, a rational jury could conclude beyond a reasonable doubt that Alade intended

to meet a woman he knew was in possession of heroin.  A rational jury could also

conclude beyond a reasonable doubt that Alade set up the meeting with Saad and arrived

at the agreed upon location with the specific intent to pick up a package of heroin for his

uncle or, at a minimum, the jury could have concluded beyond a reasonable doubt that

Alade intended to meet the courier in order to give her travel expenses with knowledge

that she was engaged in delivering "a thing" and "his uncle's stuff" and with the specific

intent to assist her in her role as a heroin courier.

Alade's reliance on <u>United States v. Rodriguez</u>, 392 F.3d 539 (2d Cir. 2004), adds

nothing to his arguments.  In <u>Rodriguez</u>, the Second Circuit reversed a conviction for

possession with intent to distribute heroin (under both an aiding and abetting theory and a

constructive possession theory) and conspiracy to distribute heroin.  In that case, the

---

[25]

| ABBY: | Mmm, okay, cause uh, these people they want to have your number so they can call you. |
| COURIER: | Oh . . . |
| ABBY: | You know you know the way they behave.  Now they don't want to give . . . |
| COURIER: | Yeah |
| ABBY: | You know they . . . so but anyway, I will give this number now okay … |

(GX 4T-4.)

evidence showed that defendant acted as a lookout and engaged in countersurveillance for a heroin transaction and that the defendant owned the vehicle that was used by others during the transaction.  Id. at 542-43, 546.  Rodriguez argued that, while he knew he was serving as a lookout, he had no knowledge of what he was serving as a lookout for – in other words, he had no knowledge that his co-conspirator was engaged in a heroin transaction as opposed to any other illegal activity – and the court of appeals agreed.  Id. at 546, 548.  The government in Rodriguez attempted to show knowledge on the part of the defendant by offering toll records of telephone calls and pages between the defendant and the co-conspirator who did have specific knowledge and intent of the nature of the heroin transaction.  The court held, however, that in the absence of "evidence of the precise contents of the conversations," the toll records alone failed to support the conclusion that defendant knew the precise nature of the criminal activity of his co-conspirator.  Id. at 547-48.

In the instant case, there was far more evidence demonstrating Alade's knowledge of the object of the charged conspiracies and his active participation therein.  While defense counsel correctly notes that, as in Rodriguez, the Government did not present evidence of the content of telephone conversations between Akin Billy Smith and Alade, the Government did present extensive evidence of the contents of the communications between Alade and the courier (or law enforcement agents posing as the courier), which, when viewed collectively with the rest of the Government's evidence, was sufficient for a reasonable jury to conclude Alade acted with knowledge that the importation and distribution of heroin were the objects of the conspiracies.  Such evidence of the contents of conversations and text messages was wholly absent in Rodriguez.

Alade argues that the reference to "this thing" and the comment "bring money. 5000" contained in text messages he received (GX 13C), Saad's question "Should I bring it to you?" and Alade's comment "This is just my uncle's stuff, I'm just helping him" (GX 4T-5), do "not establish specific intent to participate in a conspiracy to import heroin or to possess and distribute heroin."  (Alade Mem. at 22.)  Once again, standing alone, this evidence may not be sufficient, but considered in connection with the content of the recorded phone calls and text messages, Alade's admission that his uncle in Nigeria was a heroin trafficker and the rest of the Government's evidence, it is sufficient to permit a reasonable jury to conclude that the "it," "my uncle's stuff" and "this thing" referred to heroin in a sufficient amount to be worth importing and distributing – it certainly was not for Alade's or his uncle's personal use.  Alade's active attempt to meet and assist the courier as shown by his initiating contact with her, his setting the meeting at the Marathon gas station and his arrival at the meeting, coupled with evidence sufficient for the jury to conclude Alade knew that the person he was meeting was a heroin courier are sufficient for a reasonable jury to find specific intent beyond a reasonable doubt.

To the extent that Alade's papers can be read to assert that *even if* he knew the woman he intended to meet was a heroin courier, the Government still failed to put forth sufficient evidence from which a rational jury could conclude that he acted with the *specific intent* to further the objectives of the charged conspiracies (heroin importation and distribution or possession with intent to distribute heroin), such an argument is without merit.  The Second Circuit recently rejected such a theory in United States v. Heras, --- F.3d ----, 2010 WL 2431080 (2d Cir. June 18, 2010).  In Heras, where the Government put forth sufficient evidence for the jury to conclude that defendant Heras

dropped off another individual (Correa) at a meeting with the knowledge that Correa was a drug dealer and with the knowledge that the purpose of the meeting was for Correa to pick up drugs, the jury could reasonably infer that Heras had the specific intent *to distribute* cocaine, notwithstanding Heras' statements to law enforcement that the meeting "has to do with [Correa].  That has nothing to do with me."  Id. at *2-4. Repeating the well-established principle that "a defendant need not know all the details of a criminal scheme to be guilty of conspiracy," id. at *6 (citing cases), the court held that "if a defendant, with knowledge that the object of attempted drug possession is distribution, thereafter joins in and attempts to further that drug possession, a jury may reasonably find from that combination of knowledge and action that the defendant adopted the underlying intent to distribute as his own."  Id.

Here, as in Heras, because the Government presented sufficient evidence for a rational jury to conclude that Alade knew the woman his uncle asked him to meet was a heroin courier and that Alade knew the objects of the conspiracy (of which his uncle Akin Billy Smith and the courier were members) were heroin importation and distribution, if the jury found beyond a reasonable doubt that Alade intended to meet the courier in order to assist her in her role as a courier by providing travel expenses or that Alade intended to pick up a package of heroin for his uncle, the jury was entitled to infer that Alade had the specific intent to further the objectives of the conspiracies even if he did not have a personal stake in the outcome and even if he personally participated in only a small part of the larger conspiracy.

Alade argues that there are no explicit references to drugs or references to picking up something, and the fact that "it," "my uncle's stuff" and "this thing" could possibly

refer to something other than heroin. (See Alade Reply Mem. at 7 (citing United States
v. Idowu, 157 F.3d 265 (3d Cir. 1998) and United States v. Martinez-Sandoval, 01 Cr.
307 (RPP), 2003 WL 1442454 (S.D.N.Y. Mar. 6, 2003)).) Alade's argument is of no
moment because the Government "need not negate every theory of innocence." Glenn,
312 F.3d at 63. The presence of other possible inferences does not change the fact that
the evidence presented by the Government was sufficient for a reasonable jury to
conclude that Alade was referring to heroin and he knew he was speaking to a heroin
courier. Furthermore, given the contents of the telephone calls and text messages,
coupled with Alade's knowledge that his uncle is a heroin trafficker, the theory of
innocence put forth by defense counsel is one that a rational jury was entitled to reject
and this is not a case where the evidence "gives equal or nearly equal circumstantial
support to a theory of guilt and a theory of innocence." Martinez-Sandoval, 2003 WL
1442454, at *5 (citing Glenn, 312 F.3d at 64).

      In a recent case, the Second Circuit reversed a conspiracy conviction where the
defendant picked up UPS packages containing ten kilograms of cocaine in suspicious
circumstances, but where there was no evidence presented demonstrating that the
defendant knew what was in the packages. United States v. Torres, 604 F.3d 58, 69-70
(2d Cir. 2010) (holding that the record did not contain "any evidence that Torres knew
the Packages contained narcotics" and noting "[t]here was no proof of any narcotics-
related conversation to which Torres was a party"). In contrast, in this case, while there
was no direct evidence presented showing Alade's knowledge as to what "it" and "this
thing" referred to in communications he received from the undercover 718 Number, there
was significant circumstantial evidence presented that Alade knew he was meeting a

heroin courier, namely Alade's knowledge that his uncle was a heroin trafficker, Alade's admission that he was acting at his uncle's request, and Alade's comment that "[t]his is just my uncle's stuff" – directly tying the subject of the meeting to his heroin-trafficking uncle.

This case is more closely in line with United States v. Huezo, 546 F.3d 174 (2d Cir. 2008), than with Torres.  In Huezo, the Second Circuit reversed the district court's granting of a Rule 29 judgment of acquittal and reinstated the jury's conviction of defendant Huezo of aiding and abetting and conspiracy to commit money laundering. Huezo argued, and the district court agreed, that the Government offered insufficient evidence for the jury to find beyond a reasonable doubt that Huezo possessed the specific intent to engage in money laundering.  Huezo, 546 F.3d at 178.  The Second Circuit reversed, noting that Huezo resided in the same house as two co-conspirators, that Huezo on two separate occasions drove co-conspirators and $500,000 in laundered funds to a meeting, and that Huezo personally handled a small bag containing $6000 that was packaged in a similar fashion to two suitcases each containing $500,000 in laundered funds.[26] Id. at 182.  Even though there was no direct evidence that Huezo saw or knew what was in any of the bags, the court noted that:

> jurors are entitled, and routinely encouraged, to rely on their common
> sense and experience in drawing inferences.  Based on the complexity and
> scale of the money laundering scheme, common sense and experience
> would support an inference that the principals in the conspiracy would not
> have trusted an outsider (with no knowledge of their criminal purpose) to

---

[26]     See also United States v. Espaillet, 380 F.3d 713, 720 (2d Cir. 2004) (reversing district court's granting of defendant's Rule 29 motion and reinstating jury verdict of conviction, holding evidence sufficient to show knowledge where defendant was present for narcotics transaction, acted as lookout, obtained and drove vehicle for transaction and possessed a cellular telephone used during and in furtherance of the conspiracy).

> transport $1 million in laundered funds, to be present [at delivery], and to
> share a house over several days with witting conspirators.

Id. (internal citations omitted).  Similarly, here the jury was entitled to use its common

sense in evaluating the timing and frequency of the calls between Alade and his uncle in

Nigeria, as well as Alade's post-arrest statements that he knew his uncle "was involved in

heroin trafficking" and that he "didn't want to get in trouble by meeting her on Telegraph

at the hotel."  (Tr. at 555-56.)  The jury was also entitled to use its common sense in

deciding what inferences to draw with respect to Alade's knowledge from:  Saad's

comment "Should I bring it to you?" (GX 4T-5); the text message Alade received:  "do u

have money for this thing?" (GX 13C); Alade's comment "This is just my uncle's stuff,

I'm just helping him." (GX 4T-5); and Saad statement "sorry I ask so much question

because you know I don't want … mistake" to which Alade responded "I understand, I

understand." (GX 4T-5).

A rational jury could conclude beyond a reasonable doubt that Alade knew he was

speaking to a heroin courier and the two were discussing a heroin transaction.  In the

instant case, the Government presented as much, if not more, circumstantial evidence of

Defendant Alade's knowledge than the Government presented in Huezo, where such

evidence was held sufficient for a rational jury to conclude the defendant acted with

specific knowledge of, and intent to further, the object of the conspiracy.  And, unlike

Torres, evidence of knowledge presented in the instant case constituted circumstantial

evidence of more than suspicious circumstances or general criminal activity – for reasons

discussed supra, the evidence presented in this case constituted circumstantial evidence

of Alade's knowledge of the specific objects of the charged conspiracies:  heroin

importation and distribution or possession with intent to distribute heroin.

The additional Second Circuit cases relied on by Alade add nothing to his argument.  See United States v. Ogando, 547 F.3d 102, 108 (2d Cir. 2008) (holding that livery cab driver's presence at airport to pick up courier coupled with driver's personal relationship with conspirators insufficient to sustain conspiracy conviction); United States v. Cruz, 363 F.3d 187, 198-99 (2d Cir. 2004) (holding that defendant's countersurveillance activities coupled with presence at scene of crime insufficient to show specific intent for aiding and abetting conviction because that evidence was only sufficient to show defendant's knowledge that "some type of crime was being committed"); United States v. Samaria, 239 F.3d 228, 236-38 (2d Cir. 2001) (holding evidence showing defendant acted as a lookout, close association with member of a conspiracy, observation of exterior of boxes containing stolen goods, and false exculpatory statement was insufficient to support the inference that defendant was aware of the specific crimes charged and had the specific intent to participate in those crimes); United States v. Nusraty, 867 F.2d 759, 764-65 (2d Cir. 1989) (holding that waiting for a courier at the airport coupled with suspicious circumstances and a false exculpatory statement is insufficient to warrant an inference of guilty knowledge).[27]

In sum, this case involves significantly more circumstantial evidence of knowledge and intent than was present in any of the cases relied on by Alade, and indeed more circumstantial evidence than was present in cases where the Second Circuit has upheld convictions against sufficiency of evidence challenges based on alleged lack of

---

[27]     See also United States v. Tyler, 758 F.2d 66, 69 (2d Cir. 1985) (reversing conspiracy conviction and affirming aiding and abetting conviction where evidence merely showed that defendant helped a willing buyer locate a willing seller and was insufficient to establish an agreement necessary to a conspiracy conviction); United States v. Johnson, 513 F.2d 819, 823-24 (2d Cir. 1975) (holding defendant's presence in vehicle, close relationship with vehicle's occupant who had specific knowledge of narcotics importation scheme and general lack of credibility, insufficient to show knowing and intentional participation in conspiracy).

knowledge of the object of the charged conspiracy.  This case included circumstantial evidence sufficient for a rational jury to conclude Alade knew the specific objects of the charged conspiracies (importation and distribution of heroin), a type of proof wholly absent from the cases on which Alade relies in support of his Rule 29 motion for a judgment of acquittal.

## B.  Mr. Akefe

Mr. Akefe does not advance any independent arguments in support of a motion for a directed verdict and instead joins with Alade in his motion and memorandum in support of a motion for a directed verdict.  (See Defendant Akefe's motion for joinder in co-defendant's motion dated April 2, 2010.)  Because each of Alade's arguments in support of his Rule 29 motion is specific to Alade individually, Akefe's motion to join in Alade's Rule 29 motion based on Alade's factual arguments is without merit.  Further, Mr. Ogunmokun testified that he picked up heroin at the direction of Adebayo Odumade who was in Nigeria, that he personally delivered heroin to Akefe, and that he collected money in payment for the heroin from Akefe on numerous occasions, which the jury was entitled to credit.  Given that Akefe initiated contact by calling Ms. Saad at the undercover 718 Number, the response that she would be "at room 136" without giving an address, Akefe's appearance at that time at the Travelers Inn and knocking at the door of room 136, a rational jury could conclude that he knew that he was attempting to pick up heroin.  Any argument that the Government presented insufficient evidence for a jury to conclude that Akefe knowingly joined the charged heroin conspiracies is without merit.

## V.  RULE 33 MOTION FOR A NEW TRIAL

Under Rule 33 of the Federal Rules of Criminal Procedure, a district court may grant a defendant's motion for a new trial "if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  "[M]otions for a new trial are disfavored in this Circuit," United States v. Gambino, 59 F.3d 353, 364 (2d Cir. 1995), and the defendant bears the burden of showing that a new trial is warranted, United States v. Sasso, 59 F.3d 341, 350 (2d Cir. 1995).  A court must exercise its authority to grant a new trial where there is a "real concern that an innocent person may have been convicted."  United States v. Sanchez, 969 F.2d 1409, 1414 (2d Cir. 1992).

### A.  Mr. Alade

Mr. Alade moves for a new trial based on the allegedly erroneous introduction of evidence related to Alade's 2008 trial, the alleged spoliation of evidence and perjured testimony of Detective Berberich related to the Missing Call, the Court's rulings on a number of hearsay objections and the portion of the jury charge relating to specific intent. Each argument raised by Alade is addressed in turn below.

(1)  Evidence Admitted from Mr. Alade's 2008 Trial

The Government moved *in limine* to admit the fact that Alade was arrested and went to trial in 2008 (the "2008 Trial") on charges stemming from Alade's presence at an apartment in Detroit when a package containing approximately one kilogram of heroin was delivered to that apartment by express mail and to admit testimony about the facts giving rise to the arrest and evidence presented at the trial.  Because the events underlying the 2008 Trial involved a large shipment of heroin and evidence presented at trial mentioned the names "A. Smith," "Billy Akin Smith" and "Akin Billy Smith," the

Government argued that facts relevant to the 2008 Trial were similar to the facts in the charged conspiracies in this action and were therefore relevant to Alade's knowledge of the nature of the charged conspiracies in this action.  Alade opposed the admission of this evidence arguing that it was inadmissible as a prior similar act under Federal Rule of Evidence 404(b) and its probative value was substantially outweighed by the prejudice to Alade.

Prior to trial, the Court reserved ruling as to both the admissibility of evidence related to the 2008 Trial and whether it was properly admissible on the Government's direct case or only in a rebuttal case, noting that both would turn on whether defense counsel challenged Alade's knowledge of the charged conspiracies.  (Transcript of March 2, 2010 Pre-Trial Conference at 85-87.)  Prior to jury selection, in an effort to eliminate defense counsel's need to voir dire prospective jurors on the issue of a defendant's prior acquittal at trial and to eliminate the Government's need to fly in a witness who would testify about Alade's presence during the testimony elicited at the 2008 Trial, the parties agreed to a stipulation that stated Alade was present for a court proceeding in 2008 – but did not state he was a defendant at trial – and listed the pieces of evidence presented at the 2008 Trial that the Government argued connected Akin Billy Smith to the 2008 Trial. (Tr. at 16-21.)

On March 15, 2010, after one week of trial and near the end of the Government's proof, defense counsel sought to withdraw from the signed stipulation, citing a factual error.  The stipulation, as signed, stated the package of heroin was sent "from India," but defense counsel argued there was nothing in the record of the 2008 Trial to show the package was sent from India.  (Id. at 927.)  Instead of agreeing to strike or re-phrase the

two incorrect words, defense counsel sought to withdraw from the stipulation in its

entirety, making the same arguments that were raised prior to trial and before the parties

signed the original stipulation (id. at 927-31), and the same arguments made on this

motion for a new trial.  After some discussion, the Government and defense counsel

agreed to modify the stipulation so that it read the package of heroin "had been sent by

express mail from Texas to be delivered to an apartment in Detroit."  (Id. at 931.)  In

agreeing to this modification, defense counsel stated:

> Your Honor, for the record, I want to make my position clear here.  I think
> that any evidence, it is my position that any evidence in the 2007 case
> violates Rule 404(b) and should not be in.  Because the court has ruled
> that it comes in for knowledge, I have agreed to the stipulation.

(Id.)  There is some question whether defense counsel has properly preserved this

objection.  The Court did not explicitly rule that "it comes in for knowledge," rather,

defense counsel resolved its objection to the admission of evidence related to the 2008

Trial prior to jury selection on March 8, 2010 when counsel signed the initial stipulation.

Counsel's attempt to re-argue the same objection by seeking to withdraw from the

stipulation in its entirety (as opposed to merely objecting to the factually inaccurate

words) is at best a thinly-veiled attempt to get a second bite at the apple on this

evidentiary issue or an example of lawyer gamesmanship.

Even assuming that Alade's objection to evidence related to the 2008 Trial was

properly preserved, it is without merit.  First, as the Court noted at trial, such evidence is

not "prior similar act" evidence to be analyzed under Federal Rule of Evidence 404(b).

(See id. at 928.)  By eliminating any reference to acts on the part of Alade and

eliminating any reference to the fact that he was on trial, the stipulation cannot be

considered "[e]vidence of other crimes, wrongs, or acts."  Fed. R. Evid. 404(b).

Therefore, Alade's arguments that the subject of the 2008 Trial and the charged conspiracies are not "sufficiently similar" (see Alade Mem. at 28-29) to permit admission under Rule 404(b) miss the point entirely. Rather, the stipulation was offered as evidence probative to the issue of Alade's knowledge of the facts stated in the stipulation, and the Court instructed the jury about the limited purpose for which it was admitted: "It is admitted only insofar as it may show that defendant Alade had knowledge of facts that are stated in the stipulation." (Tr. at 976.)

Under Federal Rule of Evidence 403, the stipulation is properly admitted unless its probative value is substantially outweighed by the prejudice to the defendant. The probative value of the stipulation is clear. It is relevant and probative to Alade's knowledge as of 2008 that a package containing a large amount (approximately one kilogram) of heroin had been sent to Detroit and had been linked to his uncle, Akin Billy Smith. Alade argues that Akin Billy Smith was barely mentioned in the 2008 Trial and therefore the facts contained in the stipulation do not establish that Smith was involved in that case. This argument goes to weight, not admissibility, because even if the facts contained in the stipulation do not conclusively establish that Akin Billy Smith personally sent the heroin or that he was responsible for the heroin, that does not alter the fact that the stipulated facts are relevant and probative to the issue of whether Alade knew in 2009 that his uncle Akin Billy Smith was involved in heroin trafficking. Alade further attacks the probative value of the stipulation on the ground that "Mr. Alade did not contest his knowledge of his uncle's drug dealings" (Alade Mem. at 30), but the stipulation was entered into before it was clear that was the defense's position and is probative to more than the mere issue of Smith's "drug dealings." It is probative of Alade's knowledge that

his uncle was involved in heroin specifically and that his uncle was involved in large

quantities of close to one kilogram.  Further, while defense counsel may not have

contested Alade's general knowledge that Smith is a drug dealer in argument, the

Government correctly notes that counsel for Alade attempted to impeach and discredit

Agent Galu (who testified to Alade's post-arrest statements in which Alade admitted his

uncle was a heroin trafficker) both generally and specifically with respect to his

preparation of the report of Alade's post-arrest statements.  (See Gov't Mem. at 25.)

Finally, Alade argues that he was prejudiced by the introduction of the stipulation.

The theory of prejudice offered by Alade is that the stipulation informed the jury that

"Mr. Alade had a transactional relationship with the court system, and was an interested

party at that proceeding."  (Alade Mem. at 30.)  This theory of prejudice to Alade is

unpersuasive, and even assuming there was some remote possibility of prejudice based

on the jury hearing of his attendance at a court proceeding, given Akin Billy Smith was

his uncle, the stipulation did not show Alade had a transactional relationship with the

court system as an interested party as opposed to a party with an interest due to Alade's

relationship with Smith.  In any event, any possibility of prejudice was outweighed by the

probative value of the stipulation under Rule 403.[28]

(2)  Alleged Spoliation of Evidence

Alade argues that the Court's denial of his request for a spoliation of evidence

charge, based on the Government's failure to preserve the Missing Call, merits a new

trial.  Citing In re Terrorist Bombings of U.S. Embassies in East Africa, 552 F.3d 93, 147

---

[28]     Alade also argues he was prejudiced by the introduction of the stipulation by reiterating the
argument that the 2008 Trial and the charged conspiracies were not sufficiently similar.  As previously
discussed, this argument is only relevant to a Rule 404(b) analysis, which is inapplicable in this instance.

(2d Cir. 2008) and <u>Kronisch v. United States</u>, 150 F.3d 112, 126 (2d Cir. 1998), Alade

argues that he was entitled to a spoliation of evidence charge because the Government's

"intentional destruction" of the Missing Call supports the inference that the contents of

the call would have been unfavorable to the Government.  (<u>See</u> Alade Mem. at 30-32; <u>see</u>

<u>also</u> Alade Reply Mem. at 14-15 (further arguing that Government's "deliberate" or

"negligent" destruction of tape merits a new trial).)

   Critically absent in Alade's argument is any support in the record for Alade's

assertion that the Missing Call was destroyed.  Defense counsel points to inconsistencies

in the testimony of Detective Berberich and Special Agent Jordan, and urges the Court to

interpret these inconsistencies as "perjury" and "lies" by Detective Berberich.  (Alade

Mem. at 30-31; Alade Reply Mem. at 14-15.)  Detective Berberich testified that the

Missing Call was not recorded because the recording device malfunctioned.  (Tr. at 302.)

He further testified that he was not able to listen to the call at the time it took place and

therefore he did not memorialize the contents of the call in a report or memorandum at

the time and was unable to testify as to its contents at trial.  (<u>Id.</u> at 302-04, 307-08.)

Berberich testified that "at that particular time because of where we were, because you

had one party in one place, I was the 3-way point, the other party was in another place,

there was no place that I can go monitor that particular phone call *because that was*

*plugged into the recording device*."  (<u>Id.</u> at 304 (emphasis added).)  Defense counsel

seizes on this as inconsistent with the fact that it is clear from the recordings of the first

and third calls placed between Saad and Alade that Detective Berberich was listening to

the calls as they took place.  (GXs 4T-5, 4T-6; Alade Mem. at 30-31; Alade Reply Mem.

at 15-16.)  But read in its full context, Detective Berberich's testimony that he could not

listen to a call as it took place appears to be specific to the Missing Call. "Q. You are telling me there is no way to listen, you have no idea what Mr. Alade said on that phone call? A. On that *one particular phone call*, no." (Tr. at 304 (emphasis added).)[29] Defense counsel's assertion that "when Detective Berberich testified that it was impossible to listen to the calls as they were being made, his testimony was clearly perjurious" (Alade Mem. at 30), is premised on the assumption that Detective Berberich testified that he could *never* listen to any of the calls contemporaneously as they were recorded – an assumption that is not supported by a fair reading of his testimony.

Alade also points to inconsistencies between Detective Berberich and Agent Jordan's testimony. Special Agent Jordan testified that, as the 3-way point to the conference call, Detective Berberich can hear the conference call while the recording is going on. (Tr. at 1225.) This point is uncontroversial given that it is clear from the recordings of the first and third calls between Saad and Alade that Detective Berberich listened to the calls as they were recorded. Further, this point is only inconsistent with Detective Berberich's testimony to the extent that Berberich testified he could *never* hear a call as it was taking place and being recorded – an interpretation that defense counsel assumes but is, at best, unclear from the testimony.

Special Agent Jordan also testified about how the recording device operated and how it was hooked up to the telephone, stating "there is a wire attached with the earpiece. The person that is making the phone call puts the earpiece in their ear and hits the record

---

[29]   Because Detective Berberich appears to have referred solely to the Missing Call in testifying that he couldn't listen as the call was in progress, it is unclear if his testimony was that the reason he could not listen contemporaneously was *solely* because the recorder was plugged into the phone (as defense counsel assumes) or if his testimony was that the reason he could not listen contemporaneously was because the recorder was plugged into the phone *and* the recorder malfunctioned.

button and makes the call.  And the recorder picks up both sides of the conversation" (id. at 1214) and "[t]he recorder wasn't hooked up to the phone.  The recorder is a device that you hold, and the person that is on the phone wears the piece in their ear" (id. at 1224). Detective Berberich testified that the phone that was used as the three-way point was plugged into the recording device.  (Id. at 304.)  This is a contradiction, but there is no indication which witness's testimony was incorrect.[30]  If Detective Berberich was correct in his description of the equipment and the recorder plugs into the telephone and an earpiece plugs into the recorder, the call is essentially wired through the recording device and Detecitve Berberich's assertion that he could not listen to the call for which the recording device malfunctioned becomes more plausible.  Even assuming Agent Jordan was correct in her description of the equipment and Detective Berberich was mistaken, there is no indication in the record that he intentionally lied as opposed to being unclear in his answers or mistaken in his recollection.

In sum, there exist certain ambiguities in the testimony related to the Missing Call, primarily related to whether Detective Berberich could hear the Missing Call as it took place and how the recording device was connected to the telephone.  Instead of clearing up these ambiguities on the record, defense counsel now urges the Court to adopt its characterization of Detective Berberich's testimony as lies and perjury.  Relying solely on defense counsel's own characterization of Detective Berberich's testimony, defense counsel further asks the Court to follow its logic, which is far from clear, and assume that the Government recorded the Missing Call and then intentionally destroyed it because it

---

[30]    In fact, it appears most likely that Agent Jordan was mistaken in her description of the equipment because if an earpiece connected to the recorder is needed to hear the conversation that is being recorded (as opposed to hearing the call out loud over speaker phone), it does not appear that the recorder could pick up the telephone conversation without being plugged into the telephone.

was exculpatory.[31]  Because there is no support in the record for the premise that Detective Berberich lied in his testimony, there is no basis to assume that the Missing Call was recorded and then destroyed by the Government.  While the Missing Call clearly would have related to the change of meeting to the Yum Yum Donut Shop, there is no basis to assume the Missing Call would have been exculpatory.

Because a spoliation of evidence charge requires a party's "intentional destruction" of evidence, Kronisch, 150 F.3d at 126; accord In re Terrorist Bombings of U.S. Embassies in East Africa, 552 F.3d at 147-48, there was no support in the record for such a charge and it was not error for the Court to deny defense counsel's request. Further, even in the absence of a spoliation charge, counsel for Alade was able to – and did – argue to the jury that Government witnesses were not credible because of the Missing Call and that they should draw the inference that the Missing Call would have been favorable to Alade.  (Tr. at 1413-14.)  Because the Court did not err in denying defense counsel's request for a spoliation of evidence charge and because defense counsel retained its ability to argue the issue of spoliation to the jury, the interests of justice do not require a new trial under Rule 33 because of the Missing Call.[32]

---

[31]     (See Alade Reply Mem. at 15 ("The only logical reason for Detective Berberich to falsely claim that he could not hear the contents of a call when he clearly could is so that he would not have to testify as to the contents of that call, and the only reason why he would not want to testify as to the contents of that call is because that testimony would exculpate Mr. Alade.").)

[32]     Alade makes an additional argument – raised for the first time in his reply memorandum – that the Government's failure to preserve the Missing Call amounted to a violation of Brady v. Maryland, 373 U.S. 83 (1963) and Alade's due process rights, and therefore the Government's failure to preserve the Missing Call standing alone merits a directed verdict or new trial.  (Alade Reply Mem. at 14-19.)  But like Alade's request for a spoliation of evidence charge, these new arguments rest on the assumption that the Missing Call was exculpatory, which in turn rests on the premise that Detective Berberich lied on the stand.  For reasons already discussed, there is no support in the record or in the motion papers that Detective Berberich perjured himself and Alade's Brady and due process arguments are without merit.

Alade also argues he was entitled to a spoliation of evidence charge based on Agent Livanis' failure to preserve text messages sent from and received on the 718 Number in the form of the cellular telephone corresponding to the 718 Number itself. This argument is without merit.  First, Alade cites no authority for the proposition that the Government has an absolute duty to maintain digital evidence in a particular form.  Agent Livanis testified how he transcribed the text messages in his report and the jury was free to weigh the reliability of his procedure and the credibility of his testimony as it saw fit. Second, the Government's failure to retain the actual phone that sent and received text messages using the 718 Number caused no prejudice to Alade because the same information – records of calls from Alade's numbers and text messages to and from Alade – were also presented at trial through Alade's phone records (GXs 13A, 13C) in a format defense counsel does not challenge.  The Government's failure to preserve the phone used by agents to send and receive text messages, posing as the courier, on February 19 and 20, 2009 does not require a new trial in the interests of justice under Rule 33.

(3)  <u>Hearsay Rulings</u>

Alade takes issue with a number of hearsay rulings by the Court.  (Alade Mem. at 13, 32-33.)  Defense counsel repeatedly asked the Government's law enforcement witnesses what other agents observed and what other agents told the testifying witness (<u>see, e.g.</u>, Tr. at 258-61, 263, 268, 281, 289, 313, 318, 701-02), to which objections were routinely sustained.  Defense counsel's repeated assertions at trial that she was eliciting the testimony for knowledge, state of mind or effect on the listener notwithstanding (<u>see, e.g.</u>, <u>id.</u> at 265-66), the questions, as phrased by counsel, call for rank hearsay.  Further,

nothing in the Court's rulings "frustrated the defendant's ability to question these agents about their decision-making" as Alade asserts.  (Alade Mem. at 32-33.)  Rather, the Court held a lengthy sidebar at trial where counsel for Alade explained part of their theory of the case – that the investigation was flawed, agents had made mistakes and therefore in February 2009 they were desperate to make arrests.  (Tr. at 265-66.)  After counsel's explained the relevance and her position that the testimony sought was "offered as to his state of mind" and "not offered for the truth of it," the Court stated "[p]hrase your questions appropriately then" (id. at 266), inviting counsel to either lay a proper foundation for the testimony which would normally (if offered for its truth) be hearsay or to frame questions in a way that focused on the witness's knowledge and state of mind directly instead of focusing solely on the contents of the challenged out of court statements.  In sum, nothing in the Court's hearsay rulings prevented defense counsel from adequately and skillfully presenting its theory of the case and the interests of justice do not require a new trial on this ground.

(4)  <u>Specific Intent Jury Charge</u>

Finally, Alade takes issue with the Court's jury charge as it relates to specific intent – in particular, the Court's explanation of the term "knowingly and intentionally" as "deliberately and purposely" and "the product of the defendant's conscious objective rather than the product of a mistake or an accident or mere negligence or some other innocent reason."  (<u>Id.</u> at 1482.)  Alade claims the Court's charge "did not explain that the government had to prove that Mr. Alade had any knowledge of the purposes of the conspiracy" and Alade contends that "[a]ll that was required, according to the charge, was that Mr. Alade's actions were deliberate."  (Alade Mem. at 34.)  He further argues

that the Court's explanation of the term "unlawfully" as "simply contrary to law"

confused the jury and may have led them to conclude that a defendant "need *only* have

been aware of the generally unlawful nature of the acts."  (Id. (emphasis added).)  First,

the portions of the charge which Alade chooses to challenge are sections explaining

specific terms, not portions representing the Court's statements of the Government's

ultimate burden on any issue.  Second, Alade's arguments demonstrate a failure to read

the charge as a whole and conveniently ignore sections where the Court made it clear that

the Government needs to prove specific intent beyond a reasonable doubt.  Immediately

prior to the challenged excerpts of the charge, the Court instructed the jury that:

> The government must prove beyond a reasonable doubt that each
> defendant knowingly and intentionally entered into the conspiracy with a
> criminal intent, that is, with a purpose to violate the law, *and that each
> defendant agreed to take part in the conspiracy and to promote and
> cooperate in its unlawful objectives*.

(Tr. at 1481-82 (emphasis added).)  The Court then instructed on the specific intent

requirement a number of times

> If you conclude that the government has proven beyond a reasonable
> doubt that one or both of the conspiracies charged in the indictment
> existed, then you must next determine the second question:  did the
> defendant you are considering intentionally participate in the conspiracy
> with knowledge of its unlawful purpose and in furtherance of its unlawful
> objective.
> . . .
> It is for you to determine whether the government has established to your
> satisfaction, beyond a reasonable doubt, that each defendant knowingly
> participated in each of the charged conspiracies with the intent to further
> its unlawful purpose.
> . . .
> In sum, a defendant with an understanding of the unlawful nature of the
> conspiracy must have intentionally engaged, advised or assisted the
> charged conspiracy for the purpose of furthering the illegal purpose of the
> charged conspiracy.

(<u>Id.</u> at 1481, 1483, 1484-85.)  The Court's charge as to specific intent was proper and

Alade's arguments that a jury could have been misled and convicted under a lesser

standard are without merit.

Counsel for Alade also requested a jury charge based on language in <u>United</u>

<u>States v. Ceballos</u>, 340 F.3d 115 (2d Cir. 2003), which states that in order for a defendant

to be convicted of conspiracy, "he must in some sense promote [the] venture himself,

make it his own, have a stake in its outcome, or make an affirmative attempt to further its

purposes."  <u>Id.</u> at 124 (internal citations omitted); <u>see also</u> <u>id.</u> at 127-28 ("There must be

proof that he intended to join the conspiracy, that is, that he participated in it, or in some

way made an affirmative attempt to further the conspiracy's purposes, or made it his own

venture in the sense of having a stake in its outcome.").  The Court denied defense

counsel's requested charge that incorporated all of the above-quoted language.  (Tr. at

1285-91.)  The Court rejected the "stake in the outcome" language as possibly conveying

that the Defendant had to be shown to have an investment in the venture.  (<u>Id.</u> at 1291.)

Further, the recitation of types of proof that could be sufficient to show specific intent to

join a conspiracy, as outlined in <u>Ceballos</u>, is a non-exhaustive list and the types of proof

are listed in the alternative, as the Court noted during the charging conference.  (<u>Id.</u> at

1287.)  Incorporating the language in the jury charge would have at best been superfluous

and at worst caused jury confusion.  Nothing in the Court's charge on specific intent was

contrary to controlling case law.

## B.  Mr. Akefe

Mr. Akefe moves for a new trial based on two grounds, the Court's admission of a

<u>Brutonized</u> statement by Alade which Akefe argues violated his right of confrontation

and the denial of Akefe's motion to suppress the evidence seized from his vehicle during

his arrest without an evidentiary hearing.

(1)  Brutonized Statement

      The Government moved, *in limine*, to admit a Brutonized version of a post-arrest

statement made by Alade.  According to Agent Galu, upon seeing Akefe, Alade said, in

sum and substantce, "I told you I could have helped you guys."  (Government's

Memorandum of Law in Support of its Motions *In Limine* dated February 23, 2010 at

14.)  The Government proposed to replace Akefe's name with "another individual

arrested in the same case" (id.), and after hearing argument at the final pre-trial

conference, prior to jury selection, the Court granted the Government's motion (Tr. at

22).

      At trial, the Government elicited the following testimony from Agent Galu:

> Q.    Other than this post-arrest interview, did Mr. Alade make any other
>        statements to you?
> A.    He did.
> Q.    When did he make those statements?
> A.    When, later that evening, I had transported Mr. Alade to the
>        Wayne County jail and as I was escorting Mr. Alade from my
>        vehicle to the jail processing center, he stated that, he said, oh man,
>        I didn't know you guys got him too, man, I can help you out, I can
>        help you out.
> Q.    Who was he referring to?
> A.    Another person arrested in this case.

(Id. at 566-67.)  A lengthy sidebar followed where counsel for Akefe objected and moved

for a mistrial.  (Id. at 573.)  The argument focused on whether "another person arrested in

this case" was too suggestive.  The Court noted that it would have been preferable if the

testimony "came out as a single question and answer" but allowed the testimony because

the Government's motion *in limine* had already been granted with respect to the

Government's proposed formulation (including "another person in this case") and because "there is no evidence only two persons were arrested in this case." (Id. at 570-73.) In fact, the defense had made it clear that other persons had been arrested in this investigation, including, but not limited to, Hafrida Saad, Ademilola Ogunmokun, Raymond Nsoedo and Lavan Robertson. (See id. at 225, 232, 332, 603-04, 752.)

Defendant Akefe's reliance on Crawford v. Washington, 541 U.S. 36 (2004), in attacking the Government's use of Alade's Brutonized statement is misplaced because Crawford held that testimonial hearsay offered against a criminal defendant is unconstitutional under the confrontation clause and therefore inadmissible. Here, the challenged testimony was offered only against Alade and the jury was instructed accordingly. (Tr. at 944, 1490-91.) Therefore, Crawford is inapplicable and Alade's Brutonized post-arrest statement admitted solely against Alade is only violative of Akefe's confrontation clause rights if it violates the rules set out in Bruton v. United States, 391 U.S. 123 (1968), Richardson v. Marsh, 481 U.S. 200 (1987), and their progeny. The Second Circuit has been clear that statements made by defendants are admissible against the speaker where the statement is redacted to replace the names of co-defendants with neutral pronouns and the statement on its face does not connect co-defendants to the crimes. See United States v. Sanin, 252 F.3d 79, 84-85 (2d Cir. 2001); United States v. Tutino, 883 F.2d 1125, 1135 (2d Cir. 1989).

The statement at issue here falls squarely within Second Circuit precedent because Akefe's name was replaced with a neutral pronoun and the statement, standing alone, did not implicate Akefe. There was no evidence that the two defendants on trial were the only individuals arrested in the investigation. Rather, throughout the trial there

was mention of numerous others who were arrested during the course of the same investigation that resulted in the arrests of Alade and Akefe.  (See Gov't Mem. at 18.)

(2)  Suppression Motion

Next Akefe argues that the Honorable Deborah A. Batts, who presided over this case before it was transferred to the undersigned, improperly denied his pre-trial motion to suppress the evidence seized from his vehicle at the time of his arrest.  The Government correctly notes that "Akefe has not presented any new facts or law, or exceptional circumstances, that would undermine Judge Batts' proper denial of his suppression motion . . . ." (Gov't Mem. at 42.)  Rather, Akefe makes the conclusory assertion that "[o]n October 14, 2009, this motion was improperly denied by a different judge in this court without an evidentiary hearing.  The Court made its findings without a factual record and with very little explanation as to its ruling."  (Akefe Mem. at 7.)  To the contrary, in a thorough ten-page order dated October 14, 2009 (the "10/14/09 Order"), Judge Batts ruled that given the totality of the circumstances, probable cause existed for law enforcement officials to arrest Akefe on February 20, 2009 (10/14/09 Order at 7), that the search of Akefe's vehicle was a lawful search incident to an arrest where it was reasonable for law enforcement officials to believe evidence relevant to the crime of arrest might be found in the vehicle (id. at 7-8 (citing Arizona v. Gant, 129 S. Ct. 1710, 1719 (2009)), that an evidentiary hearing is not necessary where a defendant has not raised a factual dispute by "definite, specific, detailed, and nonconjectural" moving papers (10/14/09 Order at 5 (citing United States v. Pena, 961 F.2d 333, 339 (2d Cir. 1992))), and that in this case, Akefe's conjecture that he does "not recall" being advised of his Constitutional rights was insufficient to raise a factual dispute requiring an

evidentiary hearing (10/14/09 Order at 8-9).  Akefe has provided no reason the Court

should revisit Judge Batts' ruling and, in any event, after review of the 10/14/09 Order

the Court finds no error and nothing in that ruling that requires a new trial in the interests

of justice.


### VI.  MR. AKEFE'S MOTION FOR RECONSIDERATION OF DETENTION PENDING SENTENCE AND APPEAL

Finally, Mr. Akefe moves the Court for reconsideration of its oral order

remanding him to federal custody after the jury returned its verdict, arguing that pursuant

to 18 U.S.C. § 3145(c) and United States v. DiSomma, 951 F.2d 494 (2d Cir. 1991), there

are "exceptional reasons" why his detention is not appropriate.  The only exceptional

reasons cited by Akefe are his view that a number of issues on appeal "appear to be ones

that will entitle the defendants to some relief in this matter" and the fact that Akefe is the

sole owner of his real estate company and he is the only one who can finalize certain

lucrative contracts with the City of Detroit.  (Akefe Bail Mem. at 4.)  For the reasons

discussed in this opinion, the Court is of the view that the issues raised by Akefe on his

new trial motion do not present issues that will likely prove meritorious on appeal and

thus do not represent "exceptional reasons."  The need to run his business is a personal

concern and is in no way a remarkable or uncommon factor, nor is it truly exceptional or

"out of the ordinary."  See United States v. Lea, 360 F.3d 401, 403 (2d Cir. 2004).  Any

convicted criminal defendant who owns a business or is employed in any way will have

concerns similar to those of Akefe, further demonstrating that his situation does not

represent "exceptional reasons" that would merit release pending sentence and appeal

pursuant to 18 U.S.C. §§ 3142, 3143 or 3145.

## VII. CONCLUSION

For the reasons disussed herein, Mr. Akefe and Mr. Alade's motions for

judgments of acquittal pursuant to Federal Rule of Criminal Procedure 29 or for a new

trial pursuant to Federal Rule of Criminal Procedure 33 are denied in all respects. Mr.

Akefe's motion for reconsideration of detention pending sentence and appeal is also

denied.

IT IS SO ORDERED.

Dated:  New York, New York
     July 21, 2010

Robert P. Patterson, Jr.

U.S.D.J.

Copies of this order were mailed to:

Michael M. Rosensaft
Janis M. Echenberg
Assistant United States Attorney, SDNY
One Saint Andrew's Plaza
New York, NY 10007
Fax: (212) 637-2527

David Malcom Burgess
Burgess & Burgess, PC
535 Griswod, Suite 2500
Detroit, MI 48226
Fax: (313) 963-9258

Elizabeth M. Fink
36 Plaza Street, Suite 1G
Brooklyn, NY 11238
Fax: (718) 783-5853